**W.A. MONCRIEF, Jr., Appellant**
**(Plaintiff),**

**v.**

**The LOUISIANA LAND AND EXPLO-RATION COMPANY; BHP Petroleum Company, Inc.; Inexco Oil Company; and North Central Oil Corporation, Appellees (Defendants).**

**MYCO INDUSTRIES, INC. and Yates Drilling Company, Appellants (Plaintiffs),**

**v.**

**The LOUISIANA LAND AND EXPLO-RATION COMPANY; BHP Petroleum Company, Inc.; Inexco Oil Company; and North Central Oil Corporation, Appellees (Defendants).**

**Nos. 92–23, 92–24.**

Supreme Court of Wyoming.

Nov. 4, 1993.

Rehearing Denied Dec. 9, 1993.

Morris R. Massey of Brown & Drew, Casper, Robert C. Grable of Kelly, Hart & Hallman, Fort Worth, TX, for appellant W.A. Moncrief, Jr. in No. 92–23.

Phillip Wm. Lear, Salt Lake City, UT, for appellants MYCO Industries, Inc. and Yates Drilling Co. in No. 92–24.

Marilyn Kite and Jack D. Palma, II of Holland & Hart, Cheyenne, Peter A. Bjork and James L. Simmons of Poulson, Odell & Peterson, Denver, CO, for appellees in Nos. 92–23, 92–24.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

GOLDEN, Justice.

According to the parties, this declaratory judgment action involves the construction of unambiguous provisions of several written agreements relating to the non-consent drilling operations of a deep exploratory oil and gas well on acreage committed to the unitized field known as the Madden Deep Unit,[1] and the application of those unambiguous provisions to undisputed facts.

Following the publication of this court's original opinion in this case which reversed a summary judgment in favor of appellees, appellees applied for rehearing.[2] We granted that application. Appellees relied upon their memorandum of points and authorities submitted with their rehearing application, as well as upon their previous brief. Appellants also relied upon their previously filed briefs and filed a response to appellees' rehearing memorandum. Later, pursuant to this court's grant of re-

---

1. As noted in *Moncrief v. Wyoming Bd. of Equalization*, 856 P.2d 440, 442 n. 2 (Wyo.1993), for several years "this large federal oil and gas unit has not only produced significant amounts of natural resources but it also has contributed generously to this court's case load."

2. *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 500 (Wyo.1993) (withdrawn upon grant of rehearing). Appellees' rehearing pleading was titled, "Motion to Vacate Mandate of

hearing, oral argument was held on June 24, 1993.[3]

Upon the rehearing, a majority is now convinced that this court's original opinion was in error. Accordingly, that original opinion is herewith withdrawn. To place this in proper perspective, the following background is provided. Having the declaratory judgment action before it, the district court, in a summary judgment setting, determined that the provisions of the several written agreements were unambiguous and that the consenting parties (appellants) to the proposed drilling of the deep exploratory well in question constituted a minority in interest in the deep well's 640–acre drilling block area. Consequently, the district court held that the non-consenting parties (appellees) had to pay a penalty of 1,000 percent of the drilling costs and the cost of newly acquired equipment to and including wellhead connections, but did not have to execute an assignment to the consenting parties of their lease interests in a number of sections.

In this court's original opinion, a majority reversed the district court's summary judgment. The majority concluded (1) the doctrine of equitable conversion was applicable to the farmout agreement in question and the farmees, who belonged to the group of consenting parties, had earned an equitable interest in the farmout acreage when drilling of the deep exploratory well commenced and (2) the unit operating agreements were ambiguous with respect to (a) whether all acreage within the 640–acre drilling block area, including the 160–acre farmout tract, must be accounted for as either consenting or non-consenting, and

(b) at what point in time the parties' ownership interests must be assessed, i.e., when they elect whether or not to participate in the drilling of the well or when the drilling of the well is commenced. Having concluded that these ambiguities existed, the majority remanded with directions that the district court consider extrinsic evidence to determine the parties' intent.

Having had the benefit of rehearing, a majority of this court has now concluded that the district court's summary judgment must be affirmed.

In the briefs originally filed, the respective parties presented certain issues to be addressed. As seen by appellant W.A. Moncrief, Jr., (Moncrief), the issues were:

A. The district court erred in ruling that the Farmout acreage did not constitute a committed working interest.

B. The district court erred in ruling that the Farmout acreage was not a carried working interest.

C. The district court erred in concluding that the Farmout acreage did not qualify as a working interest under the Unit Agreement.

D. The district court erred in ruling that Moncrief was not vested with an interest in the nature of an equitable title.

E. The district court erred in concluding that the interest of Moncrief in the Farmout was not an interest in the lease under federal regulations.

Appellants MYCO Industries, Inc. (MYCO) and Yates Drilling Company (Yates), being aligned with Moncrief, listed these issues:

A. Whether the district court committed reversible error by considering the

Reversal and For an Order of Affirmance or, In the Alternative, For Rehearing Including Memorandum of Authorities." By our order entered March 16, 1993, this court denied the motion to vacate mandate of reversal because the mandate had not yet issued and this court granted the application of rehearing.

**3.** On July 23, 1993, appellants filed a post-argument brief; appellees moved to strike that brief; and by order entered August 10, 1993, this court granted appellees' motion.

consenting parties' ownership interests at the time the well was proposed instead of at the time drilling operations commenced thereby concluding that the 160–acre tract was not "committed working interest" acreage owned by a party to the supplemental unit operating agreement?

B.  Whether the district court committed reversible error by concluding Amoco's interest was not a "carried working interest" even though the farmees held a present interest in the working interest of the 160–acre tract and were obligated to pay all of the costs of the well while Amoco had no obligation to contribute to the costs?

Appellees, consisting of the Louisiana Land and Exploration Company, BHP Petroleum Company, Inc., Inexco Oil Company, and North Central Oil Corporation (all of whom are hereinafter collectively referred to as "non-consenting parties"), declared a single issue:

The District court was correct in ruling that Moncrief, MYCO, and Yates are not a "majority in interest" in the drilling of the Exploratory well in the Madden Deep Gas Unit.

## FACTS

On May 1, 1967, the parties to this dispute, or their predecessors in interest, Amoco Production Company (Amoco), and others entered into a unit agreement for the Madden Deep Unit Area (unit agreement) covering about 70,000 acres in Natrona County and Fremont County, Wyoming. Each party's working interest in acreage committed to the unit was listed on Exhibit B attached to the unit agreement. Amoco was the working interest owner of the 160–acre tract of land at issue in this case,[4] and Amoco held a federal oil and gas lease on this tract. Amoco's working interest was shown on Exhibit B.

On April 2, 1968, the parties to this dispute, or their predecessors in interest, entered into the so-called Madden–Badwater Agreement. Article III of that agreement, titled "After Acquired Leases," provided, in relevant part, that if a party acquires an interest in an oil and gas lease within a certain designated area then that party shall promptly offer an interest in such lease interest to the other parties. An offeree has ten days in which to notify in writing the offeror of its election to participate in the acquisition.

On June 17, 1969, the parties to the unit agreement entered into a Revised Unit Operating Agreement (Revised UOA). Among others, the parties to this Revised UOA include Amoco and the parties to this dispute, or their respective predecessors in interest. As to all parties, the Revised UOA governs unit operations at subsurface depths above the base of the Waltman Shale.

On June 2, 1975, some of the parties to the Revised UOA, notably including appellants and appellees, entered into a Supplemental Unit Operating Agreement (Supplemental UOA) to govern operations at subsurface depths greater than 5,500 feet below the base of the Waltman Shale. Amoco did not enter into this Supplemental UOA. Accordingly, Amoco's deep rights, i.e., rights at subsurface depths greater than 5,500 feet below the base of the Waltman Shale, continued to be governed by the Revised UOA. In summary, then, either the Revised UOA or the Supplemental UOA, or both, apply to operations of the Madden Deep Unit, depending upon the depth of the drilling and the identity of the parties involved.

In May, 1990, Moncrief obtained a commitment from Amoco to enter into a farm-

---

**4.**  The tract's legal description is the NE¼ of Section 12, Township 38 North, Range 89 West, 6th P.M.

out agreement [5] covering Amoco's 160–acre tract. Amoco's lease was not in danger of expiring if drilling was not expeditiously commenced. Rather, the lease was held by production. The parties agree that Amoco's purpose in entering into the farmout was to obtain geologic information.[6] Moncrief and Amoco continued negotiations about the specific terms of the farmout agreement into July, 1990. They did not finalize these terms until July 26, 1990, or a few days thereafter.[7] Before we examine more closely their negotiations and the relevant language of the farmout agreement as it appeared both in the initial proposed agreement and in the finalized agreement, we shall note the other events that transpired during the time period in which those negotiations continued.

By Moncrief's letter dated May 31, 1990, showing addressees as

> "Madden Deep Group
> Madden Deep Unit
> Working Interest Owners"

Moncrief discussed the Amoco farmout, proposed an exploratory well to be drilled on the farmout tract, designated the drilling block area for this exploratory well, and invoked the provisions of both the Re-

vised UOA and the Supplemental UOA concerning the election whether or not to participate in the drilling of the proposed well. About the Amoco farmout, Moncrief stated he "has obtained" the farmout covering Amoco's 160–acre tract "which will be earned by drilling a well on or within a mile of said tract." About the drilling of that well, Moncrief proposed "a 24,500' Madison test in the SW¼ NE¼ of Section 12," which was the Amoco tract, under the terms of both the Revised UOA and the Supplemental UOA. Moncrief designated the 640 acres of Section 12 as the drilling block area "for this exploratory Madison well." About the working interest owners' election whether or not to participate in the proposed exploratory well, Moncrief stated, "[u]nder the terms of [both the Revised UOA and the Supplemental UOA], kindly advise of your decision within the 30–day required time period." It is useful to remember that this letter was sent May 31, 1990, but the Moncrief–Amoco farmout agreement was not finalized until July 26, 1990, or a few days thereafter.

It is evident that in the time period between Moncrief's May 31 letter and another letter written by Moncrief dated July 11,

---

**5.** One scholar has described a farmout in this way:

> An oil and gas farmout agreement is an agreement by one who owns drilling rights to assign all or a portion of those rights to another in return for drilling and testing on the property. The individual or entity that owns the lease, called the "farmor" or "farmouter," is said to "farm out" its rights. The person or entity that receives the right to drill, referred to as the "farmee" or "farmoutee," is said to have "farmed in" to the lease or to have entered into a "farm-in agreement."

JOHN S. LOWE, *Analyzing Oil and Gas Farmout Agreements*, 41 SW.L.J., 759, 763 (1987); *see also*, EDWIN M. CAGE, *Anatomy of a Farmout*, 21 ANNUAL INST. ON OIL & GAS L. & TAX. 153, 154 (1970).

**6.** Among the farmor's possible purposes for entering into a farmout are lease preservation, lease salvage, risk sharing, exploration and evaluation, access to market, obtaining reserves, and drilling an obligation well. Among the farmee's purposes are obtaining or expanding an acreage position or obtaining reserves; keeping busy equipment, personnel or cash; obtaining property it has highly evaluated; and risk sharing. LOWE, *supra* note 5, at 778–82.

**7.** The negotiations consisted of the initial proposed agreement dated July 5, 1990, offered by Amoco; Moncrief's counter-offer embodied in

its July 20, 1990 letter; Amoco's counter-offer embodied in its July 26, 1990 response; and Moncrief's acceptance of the Amoco response a few days later. Under basic principles of contract law, "[a]n unconditional, timely acceptance of an offer, properly communicated to the offeror, constitutes a meeting of the minds and establishes a contract." *Wyoming Sawmills, Inc. v. Morris*, 756 P.2d 774, 775 (Wyo.1988) (citations omitted). "To be effective an acceptance must be unconditional; it cannot be combined with any conditions which materially vary the terms of the offer. If such conditions are included, the acceptance is treated as a rejection of the original offer and acts as a counter offer vesting in the original offeror the power of acceptance." *Madison v. Marlatt*, 619 P.2d 708, 715 (Wyo.1980). "[N]o contract exists unless the original offeror accepts the counter-offer." *Panhandle Eastern Pipe Line Co. v. Smith*, 637 P.2d 1020, 1023 (Wyo.1981). Applying these principles to the Amoco–Moncrief negotiations, the farmout agreement did not come into existence until a few days after July 26, 1990, when Moncrief accepted the changes contained in Amoco's July 26, 1990 response to Moncrief's July 20, 1990 changes in Amoco's initial July 5, 1990 proposal.

1990, the contents of which we will describe shortly, the parties made their first of two elections whether or not to participate in Moncrief's proposed exploratory well. Appellants (the consenting parties) elected to participate in the proposed exploratory well to be drilled on the Amoco tract. Appellant Yates also agreed to participate in the Moncrief–Amoco farmout, the agreement for which was still being negotiated. Appellees (the non-consenting parties) elected not to participate either in the proposed exploratory well or the proposed farmout. These foregoing facts are evident from the contents of Moncrief's July 11 letter addressed to the parties to this dispute. In that letter Moncrief announced which of the parties had elected to participate in the proposed well and which had elected not to participate. Noticeably absent from either group was the name of Amoco. In that letter, Moncrief also specifically referred to Section 6.4 of Article 6 of the Supplemental UOA, which is titled "Non–Consent Drilling," stating his intention to proceed with the drilling of the proposed exploratory well even though more than fifteen percent of the total working interests had elected not to participate. Section 6.4 provides in relevant part that if more than fifteen percent of the working interests initially elect not to participate in the proposed well and if the proposer of the well still desires to proceed with the well, then the parties must make a second election. That is, within ten days, each of the parties shall again elect whether or not it wishes to participate. Since Moncrief's July 11 letter invoked Section 6.4, Article 6, Supplemental UOA, each of the parties then had ten days in which to make its second election. A party's failure to make the election constituted an election not to participate, according to Section 6.4. Thus, the results of that second election would have been known by July 22, 1990.

From our examination of the record, we find no indication that Amoco as a party to the Revised UOA, but not the Supplemental UOA, affirmatively elected to participate in sharing the costs to be incurred in Moncrief's proposed exploratory well. Obviously, during the time period in question, May–July, 1990, Moncrief and Amoco were negotiating the terms of their farmout arrangement. Of course, one of the key features of a farmout arrangement is that the farmor, such as Amoco, incurs none of the costs associated with the proposed farmout well.[8] Those costs are to be borne by the farmee, such as Moncrief. By drilling the proposed farmout well, the farmee earns an interest in the farmor's tract. The farmor assigns that interest to the farmee upon the farmee's fulfillment of the terms of the farmout arrangement. Having fulfilled those terms, the farmee is deemed to have earned the interest in question.[9] At the time that the results of the second participation election would have been known, July 22, 1990, Moncrief and Amoco were still negotiating the terms of their farmout arrangement and the farmout agreement was not yet in existence.[10] We now examine more closely those farmout negotiations and the pertinent terms of the farmout agreement, both as originally proposed and as finally agreed upon.

The pertinent language of the farmout agreement as originally proposed in the document dated July 5, 1990, reads:

2. Farmee [Moncrief], on or before December 31, 1990, agrees to commence or to participate in, as to Farmor's interest, the actual drilling of a test well at a legal location in the NE¼ of Section 12, Township 38 North, Range 89 West, Natrona County, Wyoming. *Said well, once commenced, shall be continuously prosecuted, with due diligence and in a workmanlike manner, to a subsurface depth of 20,000 feet or to a subsurface depth suffi-*

**8.** As stated by Lowe, *supra* note 5, at 797, "[a]lmost by definition, a farmout is an agreement by which the farmee agrees to pay the costs of the operations contemplated. Generally that undertaking is explicitly stated in the farmout."

**9.** Under a "produce-to-earn" farmout agreement, "the farmee earns an interest in the property being farmed out by drilling and completing a

well capable of producing in paying quantities"; under a "drill-to-earn" farmout agreement, "the farmee can earn its interest merely by drilling to a specified formation or formations and conducting agreed testing." Lowe, *supra* note 5, at 793.

**10.** *See supra* note 7 and accompanying text.

*cient to test the Cody formation, whichever is the lesser depth ("contract depth"),* and shall then be completed as a producing well, a well capable of production, or plugged and abandoned within ninety (90) days from the date of commencement. Said test well shall be drilled at Farmee's sole cost, risk and expense. Except as provided in the takeover provision of Paragraph 5 hereof, the costs associated with testing, completing, equipping or plugging and abandoning said test well, as applicable, shall also be borne solely by Farmee. All contributions to the test well shall be owned solely by Farmee.

\* \* \* \* \* \*

6. *If Farmee has drilled the test well to contract depth in accordance with the terms of this agreement and has otherwise complied with the terms hereof,* Farmor agrees, upon written request within thirty (30) days of the date the test well is (check one) \* \* \* or

(b) completed as a producing well in paying quantities or as a well capable of producing or is plugged and abandoned, to execute and deliver to Farmee an assignment of all of its right, title and interest in and to the Subject Lands, reserving unto Farmor an overriding royalty of twelve and one-half percent of eight-eights (12.5% of ⅛).

(Emphasis added).

By letter dated July 20, 1990, Moncrief advised Amoco:

Enclosed herewith is one fully executed copy of the captioned Agreement dated July 5, 1990 [the Farmout Agreement] *subject to your acceptance of the following changes thereto:*

\* \* \* \* \* \*

5) Farmee [Moncrief] agrees to use his best efforts in accordance with good oil field practice to complete the test well as a producer of oil or gas, *but shall not be firmly obligated to drill the well. The only liability or penalty for failure to drill will be the forfeiture of all rights hereunder.*

(Emphasis added).

Amoco accepted this change on July 26, 1990.[11] With candor, but tellingly, Moncrief admits in his brief:

The Farmout Contract, under which *Moncrief has the right (but not the obligation) to earn the lease by drilling the Well,* is in the nature of an option.

(Emphasis added).

Moncrief spudded in the well on the designated drilling block on August 24, 1990.[12]

By letter dated August 30, 1990, Moncrief furnished to all Supplemental UOA working interest owners a list of which parties had consented to participate in the well and also how Moncrief calculated all parties' acreage so that it could be determined whether those parties who would drill the well constituted a "majority in interest" in the Drilling Block. Moncrief's calculation was as follows:

| W½, SE¼ (480.00 ac.) | | NE¼ (160.00 ac.) | | Consenting Parties in the Drilling Block (640.00 ac.) | |
|---|---|---|---|---|---|
| WAM, Jr. | 150.00 | WAM, Jr. | 145.45 | WAM, Jr. | 295.45 |
| LL & E/Inexco | 160.00 | Yates | 14.55 | Grace | 30.00 |
| North Central | 60.00 | | 160.00 | Yates | 29.55 |
| BHP | 50.00 | | | MYCO | 15.00 |
| Grace | 30.00 | | | | 370.00 |
| Yates | 15.00 | | | | |
| MYCO | 15.00 | | | | |
| | 480.00 | | | | |

11. *See supra* note 7.

12. "Spudding in" refers to "[t]he first boring of the hole in the drilling of an oil well." 8 How-ARD R. WILLIAMS AND CHARLES J. MEYERS, OIL AND GAS LAW 1182 (1991).

Thus, under Moncrief's calculation, in which Moncrief treated the working interest in the 160–acre Amoco farmout tract as belonging to himself and Yates as farmees, the consenting parties' ownership interests amounted to a "majority in interest." That is, the combined interests of the consenting parties, 370 acres, was 57.8125 percent of the 640–acre drilling block.

On September 6, 1990, Moncrief brought this action seeking a declaration that, as defined by the Supplemental UOA, the consenting parties constituted a "majority in interest" in the 640–acre drilling block.[13] On April 2, 1991, the well was drilling at a depth below 20,000 feet. Twenty-five percent of the costs of the well were allocable to the NE¼ of Section 12, and Moncrief and Yates were bearing those allocable costs. As provided in the Supplemental UOA, the consenting parties bore the costs of drilling in proportion to their shares of the drilling acreage.

On April 10, 1991, appellants filed a motion for summary judgment, asserting that no genuine issue of material fact existed and, as a matter of law, Moncrief and Yates, as farmees of the Amoco tract, were entitled to count the working interest of that tract as consenting and, therefore, the consenting parties constituted a majority in interest. In support of their motion, appellants submitted Moncrief's affidavit, attached to which were copies of many of the documents to which we have referred.

On July 5, 1991, appellees filed a cross-motion for summary judgment, asserting that, as a matter of law, appellants as consenting parties were only a minority in interest. In support of their position, appellees relied on appellants' materials and also submitted their own, including a copy of the earlier-referenced Madden–Badwater Agreement.

13. In March of 1991, Amoco assigned record

On September 18, 1991, the district court filed its decision letter opinion in which it concluded that "[t]he critical time for assessing the ownership interests was when Moncrief proposed the drilling of the well. * * * The Defendants had a right to consent or not based upon the circumstances as they were prior to commencement of drilling." In addition, the district court found, as a matter of law, that the Amoco farmout tract should not be counted as consenting acreage and, therefore, appellants as consenting parties were a minority in interest. Accordingly, the district court entered summary judgment in favor of appellees. This appeal followed.

**DISCUSSION**

1. *Standard of Review.*

In a contract case, such as this one, summary judgment is appropriate when no genuine issues of material fact exist, the provisions of the contract are unambiguous, and those provisions are controlling because the construction of the contract's provisions is for the court to decide as a matter of law. *Allmaras v. Mudge*, 820 P.2d 533, 535 (Wyo.1991). We review a summary judgment in "the same light as the trial court, using the same materials and following the same standards." *Allmaras*, at 535. However, as a matter of appellate practice, an appellate court "accords no special deference and is not bound by a district court's decision on a question of law." *Moncrief v. Harvey*, 816 P.2d 97, 102 (Wyo.1991).

We shall affirm summary judgment if it "is sustainable on any legal ground appearing in the record." *Deisch v. Jay*, 790 P.2d 1273, 1278 (Wyo.1990).

2. *Rules of Contract Construction.*

In order to evaluate the parties' positions, we must apply our established rules of contract construction. We have said:

The primary purpose in interpreting or construing a contract is to determine the

title in the lease to Moncrief.

intent of the parties. The interpretation and construction of a contract are done by the court as a matter of law. Where an agreement is in writing and the language is clear and unambiguous, the intent of the parties is to be secured from the words of the contract. The contract as a whole should be considered, taking into consideration the relationship between the various parts.

*Cliff & Co. v. Anderson,* 777 P.2d 595, 598 (Wyo.1989) (citations omitted).

■■■ We have also recognized that the parties' subsequent disagreement concerning the contract's meaning does not establish an ambiguity which would require resort to extrinsic evidence. *Cliff,* at 599. We must avoid construing a contract so as to render one of its provisions meaningless, since each provision is presumed to have a purpose. *Wyoming Game and Fish Comm'n v. Mills Co.,* 701 P.2d 819, 822 (Wyo.1985). If reasonably possible, we must avoid a construction of a contract leading to a conclusion that inconsistent provisions exist. *Shepard v. Top Hat Land & Cattle Co.,* 560 P.2d 730, 732 (Wyo.1977). In giving effect to the contracting parties' intent, as expressed in the language of their written contract, this court abides by the rule that common sense and good faith are the leading characteristics of contract construction. *Wangler v. Federer,* 714 P.2d 1209, 1213 (Wyo.1986). The language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use. *Klutznick v. Thulin,* 814 P.2d 1267, 1271 (Wyo.1991).

With the foregoing rules in mind, we turn to the critical question in this contract case and the parties' respective contentions.

### 3. *The Critical Question and the Parties' Contentions.*

The critical question we must answer is at what point in time, according to the provisions of the unit operating agreements, must the determination be made whether the consenting parties constitute a majority or minority in interest for purposes of selecting which one of the two penalty provisions shall apply to the nonconsenting parties.

Briefly stated, appellants contend that the majority-minority determination must be made at the commencement of the actual drilling of the exploratory well, that is, spudding in or as their counsel more colorfully phrased it during re-argument, when the drilling bit hits the dirt and the table moves right. At that precise moment in time and space, according to appellants, the consenting parties, Moncrief and Yates, as farmor Amoco's farmees, through the application of the doctrine of equitable conversion, which is more traditionally recognized in installment land sales transactions, acquired sufficient equitable interest in farmor Amoco's working interest in the 160-acre tract so as to entitle them to count that working interest as consenting for purposes of the majority-minority determination upon which the selection of penalty hinged.

In the event the court does not embrace appellants' equitable conversion theory, however, appellants advance several alternative arguments why the Amoco 160-acre tract must be counted as belonging to Moncrief and Yates for voting purposes. They contend the unit agreement itself, which covers the farmout tract in question, contemplates that parties (like Moncrief and Yates) may control acreage in the Unit by "independent contracts," of which a farmout agreement is a type. They also contend the unit operating agreements specify that working interests that are "carried interests," of which a farmor's interest under a farmout agreement is a type, will be credited to the carrying parties, of which farmees like Moncrief and Yates are a type. Yet another alternative argument made by appellants is that applicable federal regulations demonstrate the interest acquired by Moncrief and Yates from Amoco under the farmout agreement was an interest in a federal lease. Finally, they con-

tend Amoco assigned its federal lease to Moncrief in March 1991, albeit after the declaratory judgment action was filed, and such assignment merely confirmed the previously existing status of Moncrief and Yates as being entitled to count Amoco's working interest as consenting for purposes of the majority-minority determination.

Again briefly stated, appellees reject each of the foregoing contentions. In particular, appellees' answer to the critical question is that the majority-minority determination must be made, according to the unambiguous provisions of the Supplemental UOA, before the commencement of the exploratory well's drilling operations. In this regard, they point to the provisions of the election procedure set out in the Supplemental UOA and apply those provisions to the undisputed facts surrounding Moncrief's May 31 and July 11 notifications to the parties. Under appellees' approach, since the majority-minority determination must be made before drilling operations commence, the application *vel non* of the doctrine of equitable conversion is a nonissue. Responding to appellants' alternative arguments, appellees present arguments addressing each one.

As we shall explain, we find appellees' arguments persuasive and their positions legally correct, and, therefore, we affirm the district court's summary judgment in their favor.

### 4. *The Equitable Conversion Theory.*

▬ The issue at the heart of this controversy is whether Moncrief and Yates can be deemed to own or control Amoco's working interest in the 160–acre farmout tract, for purposes of voting that working interest as consenting, at the critical point in time that the majority-minority determination must be made for purposes of selecting the applicable non-consent penalty provision.

Moncrief and Yates claim ownership or control of Amoco's working interest by virtue of the Amoco–Moncrief farmout agreement finalized by those two entities on July 26, 1990, or a few days later. Moncrief and Yates concede that when that farmout agreement came into existence in late July 1990, they, as farmees, had a "mere option to drill a well." They assert, however, that their "mere option to drill a well" converted at the precise moment the well was spudded in on August 24, 1990, from the "mere option" to the ownership of the equitable title of Amoco's 160–acre tract. Under this equitable conversion theory, then, during the time period from May 31, 1990, when Moncrief proposed the well to August 24, 1990, just before Moncrief spudded in the well, Moncrief and Yates did not own or control Amoco's working interest so as to be able to vote it as consenting for purposes of the crucial majority-minority determination.

Because Moncrief and Yates had no such ownership or control of Amoco's working interest until the well was spudded in on August 24, 1990, under their equitable conversion theory, in order for them to prevail in this action the majority-minority determination has to be held to occur at that same time, *i.e.*, when the well was spudded in. If that majority-minority determination is held to have occurred before the well was spudded in, then at that earlier time Moncrief and Yates would not have had ownership or control of Amoco's working interest so as to be able to vote it as consenting.

Because the "spud in" date must be the date on which the majority-minority determination is made, for appellants to prevail, they must find language in the Supplemental UOA that supports that position. Ignoring the detailed election procedure provisions in Article 6 of the Supplemental UOA, in which the parties, including these appellants, have set forth a specific timing scheme to govern the sequential elections whether or not to participate that all working interest owners must make, appellants support their position with a slender reed, *viz.*, the definition of the term "Consenting Party" provided in Section 1.9 of Article 1, the definitions article of the Supplemental UOA. That definition is as follows:

"Drilling Party" or "Consenting Party" means the * * * Parties obligated to bear the Costs incurred in Drilling * * * a well in accordance with the agreement *at the commencement of such operation.*

(Emphasis added).

Leaning on this slender reed, appellants assert that a party becomes a consenting party "at the commencement of such [drilling] operation." Without citation of authority, appellants claim that "at the commencement of such [drilling] operation" is synonymous with the spudding in of the well. From this, appellants reason that in order to determine whether the consenting parties constitute a majority in interest, the critical time to calculate the ownership interests of the consenting parties is at the time of the commencement of the drilling operation, *i.e.*, when the well is spudded in.

Appellees reject appellants' argument, and so do we for several reasons. First, by relying solely on the definition of the term "Consenting Party" and by ignoring the detailed election procedure provisions that clearly govern the majority-minority determination process, appellants disregard the basic tenets of contract construction. Appellants urge us to read only an isolated part of the Supplemental UOA. We may not. We read the whole contract and consider the contract as a whole, taking into account relationships between the component parts. *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 790 (Wyo.1989). This requires us to consider as well the detailed election procedure provisions set forth in Article 6 of the Supplemental UOA. Were we to follow appellant's urging and ignore those detailed election procedure provisions, we would render those provisions meaningless; we must avoid such construction, since each provision is presumed to have a purpose. *Wyoming Game & Fish Comm'n v. Mills Co.*, 701 P.2d 819, 822 (Wyo.1985). Appellants' construction of the contract, placing its reliance on its view of the meaning of the phrase "at the commencement of the drilling operation," seemingly leads to a possible conclusion that inconsistent provisions exist. If reasonably possible, we must avoid a construction of a contract leading to a conclusion that inconsistent provisions exist. *Shepard v. Top Hat Land & Cattle Co.*, 560 P.2d 730, 732 (Wyo.1977). When the critical question to be answered is at what point in time must the determination be made whether the consenting parties or the non-consenting parties constitute a majority in interest, common sense strongly suggests that the answer more likely is found in the detailed election procedure provisions of the parties' agreement than in an isolated general definition of a single term. In giving effect to the parties' intent, as expressed in the language of their written contract, this court abides by the rule that common sense and good faith are the leading characteristics of contract construction. *Wangler*, 714 P.2d at 1213.

Second, appellants place too narrow of a construction on the phrase "at the commencement of such [drilling] operation," as it appears within the definition of "Consenting Parties." Without citation of authority, they assume that phrase means "when the well is spudded in." That gloss does not stand up well against the generally accepted meaning of that phrase. That phrase and subtle variations of it are found in various contexts in drilling clauses. For example, well completion clauses frequently contain a condition that the lessee must have commenced operations for the drilling of a well before the end of the primary term. RICHARD W. HEMINGWAY, LAW OF OIL AND GAS § 6.7, at 362 (3d Ed.1991). Delay rental clauses often call for the commencement of drilling operations before the next ensuing anniversary date of the primary term to suspend the necessity of paying the next delay rental. HEMINGWAY, *supra*, at 362 n. 292. "Such operative language has been generally interpreted to mean that operations for the drilling of a well, and not the actual spudding in or drilling of the hole, must have commenced before the end of the primary term." HEMINGWAY, *supra*. The cases are laden with examples of preliminary preparatory pre-spudding in activities that qualify as "the commencement of

drilling operations." HEMINGWAY, *supra*, at 363. Several Wyoming cases are aligned with this general interpretation. *See Le-Bar v. Haynie*, 552 P.2d 1107, 1109–10 (Wyo.1976); *True Oil Co. v. Gibson*, 392 P.2d 795, 799–801 (Wyo.1964); and *Fast v. Whitney*, 26 Wyo. 433, 442–43, 187 P. 192, 196–97 (1920). *And see* 3 EUGENE O. KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 32.3, at 75 (1989): "[I]t is generally held that acts which are preparatory to drilling are sufficient to constitute the commencement of a well and that it is not essential that the lessee be in the process of making a hole"; and LOWE, *supra* note 5, at 802–03.[14]

Third, as appellees point out, the definition of the term "Non–Consenting Parties" provided in Section 1.10 of Article 1, Supplemental UOA, does not contain the phrase "at the commencement of such [drilling] operation." Thus, a non-consenting party is "a party who has had the optional right to participate in the drilling * * * of a well and who has elected not to participate therein." Since the determinations of consenting parties and non-consenting parties are made simultaneously, if those determinations are to be made when the well is spudded in, as appellants contend, it would seem the phrase "at the commencement of such [drilling] operation" would be found in both definitions. That they are not undermines appellants' contention.

Fourth, as appellees point out, the election procedure provisions of Article 6, Supplemental UOA, which appellants have avoided treating, specifically govern the timing of the majority-minority determination. Those provisions set forth clearly the sequence of events which must occur when a party proposes the drilling of an exploratory well. When the well proposer notifies the working interest owners of its in-tention to drill a well, it also designates the drilling block area. Upon this notification, a thirty-day period comes into existence, within which each working interest owner must elect in writing sent to all other working interest owners whether or not to participate. A party's failure to make the election is deemed a non-participating election.

Upon the expiration of this thirty-day "first election" period, if more than fifteen percent of the affected parties elect not to participate, as happened here, and if a party still wishes to drill the proposed well, as happened here, then that party shall so notify in writing the other parties, as Moncrief did here on July 11. At this point in time, a ten-day period comes into existence. Within that ten-day period the parties must again elect whether or not to participate. As before, a party's failure to make the election within that time period is deemed a non-participation election.

Upon the expiration of this ten-day "second election" period, all of the affected parties shall know at that time which of them have elected to be obligated to bear the costs of the proposed well.

From the time Moncrief sent its July 11 letter notifying the parties of its intention to proceed to drill the well, those parties had ten days within which to make their "second election" to participate or not. Thus, by July 22, the date when that ten-day period expired, all of the affected parties knew which were consenting and which were not. As appellees correctly point out, Amoco and Moncrief had not yet finalized the terms of their farmout agreement on July 22. That finalization did not come until at least four days later, on July 26, when Amoco signed off on the changes Moncrief had proposed in its July 20 letter. There can be no serious question that Amo-

---

**14.** LOWE cites the classic case *Vickers v. Peaker*, 227 Ark. 587, 300 S.W.2d 29 (1957), in which the court construed the phrase "commence the drilling of a well" appearing in a farmout assignment. The farmee had executed a drilling contract, surveyed and cleared the location, constructed a road to the location, obtained a drilling permit, and moved material to the drill site. Holding that these activities, before the drill bit pierced the earth, constituted commencement of the drilling of the well, the court asked the rhetorical question: "Does 'baking a cake' begin with the preparation of the dough, or only with the actual placing of the dough in the oven?" *Vickers*, 300 S.W.2d at 32. As LOWE explains, "virtually any activity of the farmee on the land will be sufficient to commence the well properly * * *." LOWE, *supra* note 5, at 803.

co's 160–acre tract is part of the Moncrief-designated drilling block area and, therefore, must be included in any calculation of majority-minority interests. In oral argument on the rehearing, Moncrief's counsel asserted that Amoco "has to be either fish or fowl," *i.e.*, counted either as consenting or non-consenting. We agree. It would be a curious state of affairs if the working interest owner of the very land on which the exploratory well is proposed is, somehow, excluded from the election procedure.

On July 22, 1990, when the ten-day "second election" period expired, Moncrief had no "mere option to drill a well" on the Amoco tract, let alone an equitable ownership of it. On that date, only Amoco could make the election whether or not it would participate in the costs of the proposed well. We have carefully examined the record and have not found that Amoco elected to participate. Indeed, Moncrief points out in its initial appellate brief that Amoco chose not to make its own election but, rather, chose to farmout its interest to Moncrief. Moncrief asserts, without supporting authority, that Amoco's farming out of its·interest to Moncrief constituted Amoco's authorizing Moncrief to vote the farmout acreage as a consenting interest. We have carefully read the terms of the Amoco–Moncrief farmout agreement finalized on or about July 26, and have found no provision by which Amoco authorized Moncrief to make retroactively Amoco's election to participate. We are left with the fact that Amoco did not elect to participate. According to the election procedure provisions of Article 6, Supplemental UOA, as well as those of the Revised UOA,[15] a party's failure to make the election is deemed an election not to participate. Since, as Moncrief's counsel agreed at oral argument on rehearing, Amoco must be either "fish or fowl," *i.e.*, counted as either participating or not participating, Amoco must be deemed not participating.

Since we consider the Supplemental UOA as a whole, taking into consideration the relationship between the various parts, we have noted that several of the provisions of Article 10, titled "Rights and Obligations of Consenting Party and Non–Consenting Party," shed further light on the question under consideration. Section 10.1, titled "Scope of Article," provides that the unit operator shall conduct the non-consent operation (which exists when not all parties elected to participate—as here); however, if the unit operator is a non-consenting party, it may elect not to serve as operator for the operation, in which case the "Consenting Parties" shall elect one of their group to conduct the operation. This provision suggests that the groups of "Consenting Parties" and "Non–Consenting Parties" are fixed *before* operations are commenced. That suggestion is strongly reinforced when one considers the following provision which reads in pertinent part:

10.2 Conduct of Operation. *After all notices of election* whether to participate in the non-consent operation *have been received, Unit Operator shall commence work on such operation with reasonable dispatch* (within 90 days thereafter, or as promptly as possible where the drilling rig is on location) and complete it with due diligence. In the event such operation is not commenced within said ninety (90) day period, Unit Operator shall not have the right to Drill such well until notification and response as provided in Article 6 hereof have been again given and received.

(Emphasis added). The unambiguous language of this section confirms that the non-consent operation shall not commence until *after* the election notices referred to in the election procedure provisions of Article 6, which we discussed earlier, have been received. According to the section's first sentence, work on the non-consent operation shall be commenced within ninety days *after* all election notices whether or not to participate have been received. If work is not commenced within that time period,

---

**15.** Section 9.1, Article 9, Revised UOA, states that the drilling of exploratory wells is governed by the provisions of part 1 of exhibit 4. The latter provisions, in sections 4 and 5, provide that a party's failure to advise the other parties within the prescribed time period of its election to participate or not to participate shall be deemed an election not to participate.

then the election procedure provisions of Article 6 must be again invoked because, until the notification and response process of those provisions has been *again* complied with, no right to "Drill" exists. The word "Drill" as used in Section 10.2 means, according to Section 1.11 of Article 1, titled "DEFINITIONS," Supplemental UOA:

> to perform all operations reasonably necessary and incident to the Drilling of a well to its projected total depth, including *preparation of roads and drill site,* testing, logging, and, if productive of Unitized Substances, completing and equipping for Production, including flow lines, treators, separators and tankage, or plugging and abandoning, if dry.

(Emphasis added.)

Thus, if work on the non-consent operation has not been commenced within the initial ninety-day period following the receiving of the election notices, then no right to engage in preparatory pre-spudding-in activities exists until the election procedure is again initiated and completed.

For all of the foregoing reasons, we hold that, according to the unambiguous language of the pertinent provisions of the Supplemental UOA, the majority-minority interest determination must be made upon the expiration of the ten-day "second election" period as provided in Section 6.4, Article 6, Supplemental UOA.

5. *Alternative Arguments.*

Since we have not embraced appellants' equitable conversion theory, we next consider the several alternative arguments made by appellants as to why the Amoco 160–acre tract must be counted as belonging to Moncrief and Yates for voting purposes.

A. Succinctly stated, appellants assert that the Unit Agreement dated May 1, 1967, contemplates that parties, here Moncrief and Yates of appellants' group, may control acreage by leases and independent contracts such as a farmout agreement. This argument is based on the language of Section 7 of the Unit Agreement which provides that benefits of the Unit be allocated to the working interest owners "in conformity with their underlying * * * leases, or other independent contracts." Similarly, because Section 13 of the Unit Agreement grants "any party," whether "owning or controlling" the working interest of any unitized land, the right to drill a well to test any formation, appellants conclude that the Supplemental UOA contemplates an intent to permit a party to drill on farmout acreage the same as if that party owned legal title.

Appellants fail to cite legal authority in support of this argument. We have said countless times that we shall refuse to consider an issue not supported by legal authority or cogent argument. *Burg v. Ruby Drilling Co.,* 783 P.2d 144, 153 (Wyo. 1989). Moreover, the words "other independent contracts" and "owning or controlling" do not evince an unequivocal intention that farmout acreage, before the farmee performs the conditions precedent to his earning the farmout acreage, is intended to be counted as the farmee's acreage for voting purposes. Further, as we have determined in our treatment of the equitable conversion theory, the specific provisions of Article 6 of the Supplemental UOA governing the election procedure for nonconsent operations clearly set forth the critical time periods covering the majority-minority determination. The farmout agreement in question was not even in existence at the critical time when the voting was to have occurred. Appellants' argument is without merit.

B. Next, appellants argue the Supplemental UOA provides that working interest owners may "carry" the interests of others and those "carried interests" may be credited to the "carrying party" who may then vote those interests as consenting. They claim that Moncrief and Yates are "carrying parties" of Amoco's "carried interest" by virtue of the farmout agreement.

As appellees point out, several flaws exist with this argument. Appellants have cited no legal authority to support their assertion that a farmout agreement creates a "carried interest." Although appellants

ask us to consider the expansive definition of "carrying party" as the party "who assumes responsibility for that share of the costs of drilling which another party has elected not to assume," HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS, at 152 (7th ed. 1991), we find it more appropriate to consider the definition of "carried interest" to which the "carrying party" definition applies. A "carried interest" is:

> A fractional interest in oil and gas property, usually a lease, the holder of which has no personal obligation for operating costs, which are to be paid by the owner or owners of the remaining fraction, who reimburse themselves therefor out of production, if any. The person advancing the costs is the carrying party and the other is the carried party.

WILLIAM & MEYERS, *supra*, at 148.

Even more helpful is this analysis:

> The [term] carried interest * * * is now accepted as a technical one in the industry.
>
> Broadly speaking, *a carried interest is created from an arrangement between* two or more *owners of a working interest* whereby one agrees to advance development costs on behalf of the other for a period of time, retaining the right to recover fully such advances from any future production accruing to the other owner's interest. The interest of the party making the advances is referred to as the carrying interest and the interest for which advances are made is known as the carried interest.
>
> * * * * * *
>
> Customarily, the carried interest arrangement terminates when development and current operating costs have been recovered by the carrying party. *Therefore, the carried and carrying parties jointly own the working interest* and share in both costs and production.

GARY B. CONINE, *Rights and Liabilities of Carried Interest and Nonconsent Parties in Oil and Gas Operations*, 37 INST. ON OIL & GAS L. & TAX. 3–1, 3–10 to 3–12 (1986) (emphasis added.).

From this definition and analysis, we conclude that the farmout agreement in question did not create a carried interest of Amoco's tract. We agree with appellees that the Amoco–Moncrief farmout agreement merely memorialized Moncrief's option to drill a well (not a firm obligation) in exchange for Amoco's conveyance of its interest, except for Amoco's one-eighth overriding royalty interest, when the well was completed to contract depth and Moncrief requested the conveyance. At all material times, Amoco and Moncrief were not two owners of a working interest. Amoco was the sole working interest owner of its tract until Moncrief satisfied the conditions precedent in the farmout agreement. Moreover, the Amoco–Moncrief arrangement contained no "back-in" provision by which Amoco would have jointly owned the working interest in the future. And, finally, as we have mentioned before, the farmout agreement was not even in existence when the critical consent/non-consent vote took place as prescribed by the provisions of Article 6, Supplemental UOA. For all of these reasons, appellants' argument fails.

C. Appellants next contend that Moncrief's and Yates' interest under the Amoco farmout agreement was an interest in a federal lease. To support Moncrief's and Yates' assertion they can count the Amoco tract as committed to them for voting purposes, they point to 43 C.F.R. § 3000.0–5(1) that an "interest" in a federal lease "may be created by direct or indirect ownership, including options." They cite no legal authority, however, to support their conclusion that a farmout agreement, "the mere option to drill a well," is the kind of "option" intended by this regulation. Further, they cite no authority for the assertion that this regulation supports their claim for counting Amoco's acreage as acreage under Moncrief's and Yates' control for voting purposes. This argument, too, is without merit.

D. Amoco and Moncrief amended their farmout agreement by executing a document dated March 14, 1991, in which Amoco purported to make a present assignment to Moncrief of the record title to the sub-

ject 160–acre tract. We agree with appellees that this assignment is of no concern in the context of this declaratory judgment action. This action was filed to determine rights as they existed on the date the action was filed, *viz.*, September 6, 1990. Declaratory judgment actions do not determine future rights. Wyo. Stat. § 1–37–101 through 114 (1988); *White v. Bd. of Land Comm'rs*, 595 P.2d 76, 79 (Wyo.1979). The parties' positions for purposes of declaring rights in this action were fixed as of September 6, 1990, and we have no jurisdiction to determine their rights based on events transpiring after that date.

Affirmed.