**FREMONT HOMES, INC., a Wyoming corporation, Appellant (Plaintiff),**

v.

**James L. ELMER, Appellee (Defendant).**

No. 97–301.

Supreme Court of Wyoming.

March 15, 1999.

---

David B. Hooper of Hooper Law Offices, P.C., Riverton, WY, Representing Appellant. Argument by Mr. Hooper.

Richard Mathey of Reese & Mathey, Green River, WY, Representing Appellee. Argument by Mr. Mathey.

Before LEHMAN, C.J., and MACY, GOLDEN and TAYLOR,* JJ., and PRICE, D.J.

LEHMAN, Chief Justice.

At issue in this case is the interpretation of an employment contract between appellee James Elmer (Elmer) and his employer, Fremont Homes, Inc. (Fremont). The district court determined that Elmer's employment contract provided Fremont's exclusive remedies against Elmer and granted Elmer's motion for summary judgment on Fremont's claims. After a bench trial, Elmer prevailed on his counterclaim for compensation due under the employment contract. Fremont appeals both rulings. Regarding Elmer's counterclaim, we find adequate evidence to support the district court's findings and thus affirm the award. Because we hold that a contract term exempting a party from tort liability for harm caused intentionally is unenforceable due to public policy considerations, we reverse the summary judgment entered in Elmer's favor and remand the case to the district court.

* Chief Justice at time of oral argument; retired

## ISSUES

Fremont presents the following issues for our review:

I. Did the court err in finding that defendant/appellee was entitled to partial summary judgment thereby dismissing plaintiff/appellant's claims against defendant/appellee for intentional interference with a known economic advantage and breach of fiduciary duty?

II. Did the court err in finding defendant/appellee was entitled to a one-third share ($50,000) of the reserve account, required to be maintained pursuant to the contract, even though defendant/appellee's conduct disrupted plaintiff/appellant's business thereby breaching defendant/appellee's fiduciary obligation to plaintiff?

Appellee Elmer rephrases the issues in this manner:

I. A contract existed between the parties. The contract limited remedies available to the parties as against one another. Did the trial court err when it entered partial summary judgment dismissing all claims of Appellant and all claims of Appellee which were beyond the scope of the contract?

II. The contract between the parties provided for the establishment of a $150,-000.00 reserve account. The contract also provided that under certain circumstances Appellee was entitled to receive payment of one-third of the reserve account. Did the trial court err when it determined that Appellee was entitled to his one-third of the account?

## FACTS

Appellant, Fremont, sells manufactured homes. In March of 1995, Fremont, through its principals, Sam and Doug Stanbury, hired appellee Elmer to establish and manage a sales lot in Rock Springs. The parties executed a "Job Description and Compensation Agreement" that detailed Elmer's job duties and method of compensation. The Rock Springs lot opened in April of 1995.

November 2, 1998.

■ Fremont and Elmer parted ways in May of 1996, when Elmer left to open his own sales lot next door to Fremont's location. All but one of Fremont's employees quit at the same time. Fremont filed suit in May of 1996, stating a number of causes of action including intentional interference with a known economic advantage[1] and breach of fiduciary. Fremont alleged that the following conduct constituted improper interference with business and contractual relationships: (1) Elmer induced Fremont's employees to terminate their employment with Fremont and go to work for Elmer; (2) Elmer induced Fremont customers to order homes from Elmer instead of Fremont; and (3) Elmer enticed Fremont's manufacturers to cease selling their homes to Fremont and to instead sell to Elmer.

Elmer filed an answer denying Fremont's claims and asserted a counterclaim for unpaid sales commissions and other compensation under the provisions of the contract. Elmer then moved for summary judgment on Fremont's claims, arguing that the terms of the employment contract furnished Fremont's exclusive remedies against Elmer. The trial court agreed and granted Elmer's motion for summary judgment.

The case proceeded to trial on Elmer's counterclaims. The major points of contention at trial were: (1) whether a $150,000 cash reserve account had been established, and (2) if so, was Elmer entitled to a distribution from the reserve account without a vote by Elmer and the Stanburys. After a bench trial, the district court found that Fremont's profits were kept in a checking account that held over $53,000 at the end of Elmer's performance year. In addition, a $100,000 certificate of deposit had been pur-

chased with monies from this account. Combining these two amounts, the district court found that a cash reserve account containing over $150,000 had been established.

In awarding Elmer damages, the district court determined that he was entitled to one-third ($50,000) of the reserve account without a vote for distribution. On this point, the district court reasoned that Fremont had a fiduciary obligation to hold the reserve account intact for Elmer and the two Stanburys, and that, under the contract, Elmer's share of the reserve account became vested when Elmer completed one year of service with Fremont. Altogether, the district court awarded Elmer damages totaling $60,198.90.[2] Fremont timely appeals.

## DISCUSSION

### Limitation of Remedies Provision

■ The district court determined that the contract between the parties furnished Fremont's exclusive remedies and granted summary judgment in favor of Elmer on Fremont's claims for intentional interference with a known economic advantage and breach of fiduciary duty. When the interpretation of a contract is at issue, summary judgment is proper where the terms of the parties' contract do not raise issues of material fact, the contract language is plain and unambiguous, and the terms of the contract are controlling. *Kirkwood v. CUNA Mut. Ins. Soc.*, 937 P.2d 206, 208–09 (Wyo.1997); *Barlage v. Key Bank of Wyoming*, 892 P.2d 124, 127 (Wyo.1995); *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 516, 523 (Wyo.1993). Because the interpretation of a contract is purely a question of law, this court conducts a *de novo* review of the dis-

---

1. In Wyoming, the following elements must be demonstrated to sustain a cause of action for tortious interference with a contract or prospective economic advantage:

 (1) The existence of a valid contractual relationship or business expectancy;
 (2) knowledge of the relationship or expectancy on the part of the interferer;
 (3) intentional and improper interference inducing or causing a breach or termination of the relationship or expectancy; and
 (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Examination Management Servs., Inc. v. Kirschbaum*, 927 P.2d 686, 697 (Wyo.1996); *Dynan v. Rocky Mountain Fed. Sav. & Loan*, 792 P.2d 631, 641 (Wyo.1990); *Toltec Watershed Improvement Dist. v. Johnston*, 717 P.2d 808, 813–14 (Wyo. 1986). Whether interference with a contract was improper is a question of fact. *Examination Management Servs.*, 927 P.2d at 698.

2. The trial court award Elmer $1,042.90 for unpaid sales commissions and $9,156.00 for other compensation due under the contract. Fremont does not challenge these awards.

trict court's conclusions. *Anderson v. Bommer*, 926 P.2d 959, 961 (Wyo.1996); *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d at 524.

■ In interpreting a contract, our primary concern is the true intent and understanding of the parties at the time and place the contract was made. *Examination Management Servs., Inc. v. Kirschbaum*, 927 P.2d 686, 690 (Wyo.1996). We consider the contract as a whole, reading each part in light of all other parts; meaning should be afforded to all the language used by the parties if that can be done and a reasonable construction achieved. In other words, we analyze the "tenor" of the contract. *Id.* Only when a contract is ambiguous do we acquire license to construe that document by resort to extrinsic evidence. *Martin v. Farmers Ins. Exch.*, 894 P.2d 618, 620 (Wyo.1995). Ambiguity exists where a contract "is obscure in its meaning because of indefiniteness of expression or because it contains a double meaning." *Id.* (*quoting Ferguson v. Reed*, 822 P.2d 1287, 1289 (Wyo.1991)); *see Kirkwood v. CUNA Mut. Ins. Soc.*, 937 P.2d at 208. Disagreement by the parties concerning the meaning of a contract term does not render the contract ambiguous. *Kirkwood*, 937 P.2d at 209.

With these rules of contract analysis in mind, we examine the parties' contract. Paragraph two of the employment contract provides:

(e) Remedies

(i) The remedies which Elmer has against Fremont shall be limited to those remedies which are for failure to pay past accrued wages and/or bonuses or other compensation agreed upon between the parties in writing.

(ii) The remedies which Fremont shall have against Elmer shall be limited to reimbursement for misappropriated funds or equipment or entering into agreements or making contributions or financial obligations of the business which are in excess of the scope of his authority set out herein.

We must answer two questions: (1) does this contract provision limit Fremont's remedies to those listed; and (2) if so, is the provision enforceable?

■ Elmer argues that paragraph 2(e)(ii) unambiguously limits Fremont's remedies to those mentioned. Elmer also argues that the limitation of remedies provision applies to claims arising under the contract as well as claims arising outside of the contract. We agree. The limitation of remedies provision explains that Fremont's remedies "shall be limited" to those listed. In addition, the remedies provision lists remedies which, although they are indirectly related to the contractual relationship between the parties, sound in tort. More specifically, we look at two of the remedies mentioned—"reimbursement for misappropriated funds or equipment"—two torts more commonly known as theft and conversion. Because the provision clearly declares that Fremont's remedies "shall be limited" and that the remedies listed include extra-contractual remedies, we agree with the district court's determination that the contract provides Fremont's exclusive remedies against Elmer. Nevertheless, we do not agree, as a matter of public policy, that this contract term is enforceable.

■ The question for the court is whether the limitation of remedies provision, which, in effect, exempts Elmer from liability for intentional torts, is enforceable. In Wyoming, a contract limiting liability for negligence may be enforced only if it does not contravene public policy. *Schutkowski v. Carey*, 725 P.2d 1057, 1059–60 (Wyo.1986); *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Brittain v. Booth*, 601 P.2d 532, 535 (Wyo.1979). Where willful and wanton misconduct is shown, an otherwise valid release is not enforceable. *Schutkowski v. Carey*, 725 P.2d at 1060; *Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1065–68 (Wyo.1988).

Section 195, of the Restatement, Second, Contracts (1981), provides in pertinent part:

§ 195 Term Exempting from Liability for Harm Caused Intentionally, Recklessly or Negligently.

(1) A term exempting a party from tort liability for harm caused intentionally or

recklessly is unenforceable on grounds of public policy.

The rationale behind § 195 is recited in comment a: "The law of torts imposes standards of conduct for the protection of others against unreasonable risk of harm. One cannot exempt himself from such liability for harm that is caused either intentionally or recklessly." We find § 195 to be consistent with Wyoming law as found in *Schutkowski v. Carey*, its progeny, and its predecessors. We adopt Restatement, Second, § 195(1) and hold that the term in the parties' employment contract which, in effect, exempts Elmer from tort liability for harm caused intentionally or recklessly, is unenforceable on grounds of public policy.

▇▇▇ Where only a single provision of a contract is contrary to public policy and the considerations from both sides are sufficient for performance absent such paragraph, we will enforce the contract with the exception of the invalid provision. *Tate v. Mountain States Tel. and Tel. Co.*, 647 P.2d 58, 61–62 (Wyo.1982). In this case, the single provision limiting Fremont's remedies is unenforceable to the extent that it exempts Elmer from harm caused intentionally or recklessly. Fremont's claims for breach of fiduciary duty and intentional interference are reinstated to the extent that they are based on Elmer's intentional or reckless conduct. *See Dobratz v. Thomson*, 155 Wis.2d 307, 455 N.W.2d 639, 645–646 (Wis.Ct.App.1990) *rev'd* 161 Wis.2d 502, 468 N.W.2d 654 (1991). We reverse the summary judgement entered in Elmer's favor and remand this case to the district court for further proceedings on Fremont's claims.[3] Because the rest of the contract is valid, we proceed to examine Elmer's damage award.

### Reserve Account

Although Elmer was awarded $60,198.90 in damages, Fremont challenges only the $50,000 awarded under the reserve account provision of the contract. We are again required to answer two questions: (1) was the $150,000 reserve account established, and (2) if so, is Elmer entitled to one-third ($50,000) of the account without a vote to that effect?

The portions of the contract relevant to this discussion provide:

2(d) Reserve fund. A reserve fund shall be established by retaining net profit in the corporation which is allocated to sales and income from the Rock Springs, Wyoming office and which shall be used as a reserve of cash proceeds for business operations.

* * *

3(b)(i) After establishing and maintaining a $150,000 cash reserve, all of which shall come out of the net profits from the sale of units at the Rock Springs location, Elmer shall be entitled to thirty-three and one-third percent (33⅓%) of any additional net profits. The distribution of net profits after establishing the $150,000 reserve account shall be made on a annual payment schedule.

* * *

3(b)(ii) Elmer shall be entitled to a distribution of thirty-three and one-third percent (33⅓%) of the initial $150,000 cash reserve account equal to that taken by S.J. Stanbury or Doug Stanbury, but only upon the vote of two of the three of Doug Stanbury, S.J. Stanbury and Elmer being in favor of a withdrawal from the base $150,000 reserve account. There is no representation or guarantee when any distribution will be made available to Elmer or either of the Stanburys, out of the first $150,000 reserve account.

Elmer's vested one-third of the $150,000 initial reserve account is to be limited to one-third of that amount which is actually accumulated and retained during each and every separate year that it takes to accumulate the $150,000. By way of explanation, the following is to be used as a guideline:

First Year. Elmer is employed all year and a total of $85,000.00 is retained in the

---

3. We offer no opinion on Fremont's claims. If, after remand, Elmer again moves for summary judgment, the parties should then have an opportunity to more fully develop the material facts. As it stands, the materials available for summary judgment are insufficiently developed for us to determine that issue.

initial reserve account. He therefore is vested in one-third of $85,000.00.

Second Year. Elmer is employed only seven months of that year and a total retained for that year is $95,000.00. Since Elmer was employed only part of the second year, he still is vested in one-third of the first year's $85,000.00 but none of the second year's $95,000.00.

Fremont challenges the district court's finding that the $150,000 cash reserve account had been established. The factual findings of a judge are not entitled to the limited review afforded a jury verdict. *Springer v. Blue Cross & Blue Shield of Wyoming*, 944 P.2d 1173, 1176 (Wyo.1997) (*citing Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993)). While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. *Id.* Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. *Id.* Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*

The evidence presented at trial is adequate to support the district court's determination that the $150,000 reserve account had been established and maintained. The profits accrued by the Rock Springs sales lot were deposited into a checking account. Over the performance year for which Elmer sought payment, April 1, 1995, to March 31, 1996, the account shows a high balance of $264,628.18. In February of 1996, $100,000 was withdrawn from the account to purchase a certificate of deposit. On March 31, 1996, the account held $53,991.25. Combining this amount with the $100,000 certificate of deposit, the district court found that at least $153,991.25 existed in the reserve account at the end of Elmer's performance year.

Fremont argues that the district court's determination must be incorrect because its net profits for the performance year did not reach $150,000. This argument is not supported by the record. Testimony from Elmer's accountant and an exhibit detailing her calculations substantiate the district court's finding that Fremont's net profits for the performance year, even excluding rebates received after March 31, 1996, totaled $181,877.32. Fremont contends now, as it did at trial, that its net profits should not include amounts potentially payable to Elmer. However, we agree with the district court that, although these deductions may have been appropriate for tax purposes, the contract does not contemplate that Fremont's net profits be calculated in this fashion. The contract clearly states that payments to Elmer are to be paid out of net profits, and nowhere does the contract indicate that Elmer's share of the net profits should be deducted when calculating net profits.

We find it somewhat disingenuous that Fremont challenges the district court's findings, yet does not dispute the award of $9,156 under paragraph 3(b)(i) of the contract. Before Elmer left to open his own business, Fremont had paid him $37,043.98 under paragraph 3(b)(i). The award of $9,156 represents an additional amount owed to Elmer under this paragraph. Elmer was entitled to payment from profits under this paragraph only after the $150,000 reserve account was established and maintained. By its own actions, Fremont appears to acknowledge that the reserve account had been established and maintained at over $150,000. We agree with the district court's determination that the $150,000 reserve account had been established and maintained.

The next question is whether Elmer is entitled to distribution from the reserve account without a vote on the subject. On this point, the district court wrote:

[Fremont] had a fiduciary obligation under Paragraph 3.b.(ii) to hold the reserve account intact for Elmer, S.J. Stanbury and Doug Stanbury. [Fremont] has not done so and has permitted the cash reserve to be dissipated. S.J. Stanbury and Doug Stanbury, as sole shareholders, directors, and officers of Fremont Homes have either

directly or indirectly received the benefit of their share of the cash reserve. [Elmer's] share of the reserve account became vested on March 31, 1996.

This issue presents a question of contract interpretation, whether a vote is required for Elmer to receive his vested one-third share of the reserve account. Looking at the language of paragraph 3(b)(ii), especially the illustrative examples, the parties clearly intended that Elmer be vested in one-third of any funds in the reserve account at the end of any performance year that Elmer completed. Fremont does not dispute that Elmer worked for one full performance year, April 1, 1995 through March 31, 1996. Under the terms of the contract, Elmer was thus vested in one-third of any amounts (up to $150,000) in the reserve account at the end of the performance year. Fremont argues that Elmer's right to his share of the reserve account is conditioned "upon the vote of two of the three of" the Stanburys and Elmer. However, the voting provision only addresses when, not if, Elmer is entitled to a distribution: "There is no representation or guarantee *when* any distribution will be made available to Elmer or either of the Stanburys." (emphasis supplied). In reality, Fremont is contending that the voting provision allows it to deprive Elmer of vested benefits. This, the contract does not permit Fremont to do. We agree with the district court's determination that Elmer's share of the reserve account became vested at the end of the performance year, and that, under the circumstances, no vote was required for a distribution.

 Finally, Fremont contends that the equitable doctrine of unclean hands prevents Elmer from realizing his vested share of the reserve account. One of the basic tenets of equity is that equitable remedies depend upon a showing by the claimant of clean hands: "He who comes into equity must come with clean hands." *Dutch Maid Bakeries, Inc. v. Schleicher,* 58 Wyo. 374, 131 P.2d 630, 634 (Wyo.1942); *Harsha v. Anastos,* 693 P.2d 760, 762 (Wyo.1985); *Lewis v. State Bd. of Control,* 699 P.2d 822, 827 (Wyo.1985); 30A C.J.S. *Equity* § 102 (Unclean hands may be invoked only to prevent affirmative equitable relief). Here, Elmer did not seek equitable relief. Instead, he sought a remedy at law (damages) based on his claim for breach of the employment contract. Had Elmer sought an equitable remedy such as specific performance, Fremont's unclean hands assertion may have had some appeal. *See Dutch Maid Bakeries,* 131 P.2d at 634; *Takahashi v. Pepper Tank & Contracting Co.,* 58 Wyo. 330, 131 P.2d 339, 356 (Wyo.1942). However, the unclean hands doctrine does not apply to the legal remedy sought by Elmer.

### CONCLUSION

The district court's award of damages to Elmer is supported by the evidence and, accordingly, is affirmed. We reverse the summary judgement granted in Elmer's favor and remand this case to the district court for further proceedings on Fremont's claims.