2012 WY 52

**BERTHEL LAND AND LIVESTOCK, a Wyoming Limited Partnership, Appellant (Plaintiff),**

v.

**ROCKIES EXPRESS PIPELINE LLC fka Entrega Gas Pipeline LLC, and Kinder Morgan NatGas Operator LLC, both organized under the law of Delaware, Appellees (Defendants).**

**Rockies Express Pipeline LLC fka Entrega Gas Pipeline LLC, and Kinder Morgan NatGas Operator LLC, both organized under the laws of Delaware, Appellants (Defendants)**

v.

**Berthel Land and Livestock, a Wyoming Limited Partnership, Appellee (Plaintiff).**

**Nos. S–10–0227, S–10–0228.**

Supreme Court of Wyoming.

April 10, 2012.

Representing Berthel Land and Livestock: Bill G. Hibbler of Bill G. Hibbler, P.C., Cheyenne, Wyoming.

Representing Rockies Express Pipeline LLC fka Entrega Gas Pipeline LLC, and Kinder Morgan NatGas Operator LLC: David G. Ditto of Associated Legal Group, Cheyenne, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Berthel Land and Livestock (Berthel) entered into a Pipeline Easement Agreement (Agreement) with Rockies Express Pipeline (Rockies Express). After completion of the pipeline, Berthel filed an action against Rockies Express asserting claims for breach of contract and fraudulent inducement. The breach of contract claims alleged a failure to remove rock from the property and a failure to provide required as-built drawings of the completed pipeline, and the fraudulent inducement claim alleged that Rockies Express never intended to remove the rock as required by the Agreement.

[¶ 2] The district court granted Berthel summary judgment as to liability on the breach of contract claims, but required a trial on damages on those claims, and denied summary judgment on the fraudulent inducement claim. After a bench trial, the district court found that Berthel had not proven its fraudulent inducement claim or its damages for the rock removal breach. The district court awarded damages for the as-built drawings breach, but at a lesser amount than Berthel requested. Berthel appealed, and Rockies Express cross-appealed.

[¶ 3] We affirm the district court's decision on the fraudulent inducement claim and rock removal damages. We affirm in part and reverse in part the award of damages for the as-built drawings breach.

## ISSUES

[¶ 4] Berthel presents the following issues on appeal:

I. Did the district court err as a matter of law by interpreting that the pipeline easement agreement ¶ 8(m), requires removal of "surface" rocks only?

II. Are the district court's factual determinations concerning damages for ¶ 8(m), rock removal, and/or ¶ 8(q), as-built survey, clearly erroneous?

III. Is the district court's conclusion that fraudulent inducement was not committed clearly erroneous?

[¶ 5] In its cross-appeal, Rockies Express presents these issues:

1. Did the trial court commit error by granting summary judgment for Berthel on the issue of liability for failure to provide Berthel with an as-built survey?

2. Did the trial court commit error by granting summary judgment for Berthel on the issue of liability for failure to remove rocks from the easement?

3. Did the trial court commit error by allowing evidence of "bids" from Berthel's contractors and engineers that failed to reflect the correct measure of damages?

## FACTS

[¶ 6] Berthel owns an 11,192–acre ranch located between Laramie and Cheyenne, Wyoming. In 2006, Berthel and Rockies Ex-

press entered into a Pipeline Easement Agreement (Agreement), which, in exchange for $200,000, granted Rockies Express an approximately 3.5–mile easement through Berthel's land for the construction and operation of a natural gas pipeline. The Agreement provided for a 125–foot wide temporary easement during construction and a 50–foot wide permanent easement after construction.

[¶ 7] Rockies Express completed construction of the pipeline in late summer of 2007. In September 2007, Berthel filed the present action alleging that Rockies Express failed to remove rock from the premises, as required by the Agreement, and failed to provide an as-built survey that would allow Berthel to determine the full distance covered by the pipeline, also as required by the Agreement. Berthel also alleged a claim for fraudulent inducement, contending that Rockies Express never intended to remove rock from the premises and fraudulently induced Berthel to sign the Agreement with its false representation that it would remove the rock.

[¶ 8] The parties filed cross-motions for summary judgment, and the district court, the Honorable Edward Grant presiding, granted those motions in part and denied them in part. The court found no genuine issue of material fact as to whether Rockies Express violated the rock removal and as-built survey provisions of the Agreement. In so ruling, the district court did not explain the basis for its decision or provide its interpretation of the applicable Agreement provisions. The district court found genuine issues of fact as to the fraudulent inducement claim and ordered that the fraudulent inducement claim and Berthel's damages with respect to all of its claims be set for a bench trial.

[¶ 9] Upon Judge Grant's retirement, the Honorable Thomas Campbell presided over the case, and on January 19–21, 2010, a bench trial was held. At the conclusion of the bench trial, the district court entered a decision letter ruling as follows:

- With respect to the rock removal claim, the court interpreted the Agreement to require removal of only the surface rock greater than two inches in diameter. The court agreed with Berthel that the measure of damages should be the cost of repairs, but it awarded no damages because Berthel had failed in its proof. The court found that Berthel had offered damages evidence only on the cost of removing both surface rock and subsurface rock to a depth of two feet, without separating out the cost of removing just the surface rock, and there was therefore no evidence from which the court could calculate damages.

- With respect to the as-built survey claim, the court also based its damages calculation on the cost of repair, or, that is, the cost to Berthel to have an as-built survey completed. Berthel presented evidence that that cost would be $75,284.65, and that was the amount it requested in damages for the as-built survey breach. The court concluded, though, that Berthel's proposed approach of having a backhoe dig 245 holes down to a natural gas pipeline to determine its depths and contours was dangerous and unreasonable. The court thus eliminated that cost item from the damages, substituted the cost of an alternative pipeline detection method, and awarded damages of $42,820.00.

- With respect to the fraudulent inducement claim, the district court concluded that Berthel had failed to prove any element of its claim and entered judgment for Rockies Express.

### STANDARD OF REVIEW

[¶ 10] Because this case was tried to the court, we apply the following standard of review:

Following a bench trial, this court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due

regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak*, ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,

we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*Id.*

*Pennant Service Co., Inc. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo.2011) (quoting *Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010) (some citations omitted)). We review the district court's conclusions of law *de novo*. *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

[¶ 11] Because Rockies Express challenges the grant of summary judgment on the liability issues, we must also consider our standard for reviewing summary judgment orders. Motions for summary judgment come before the trial court pursuant to Rule 56(c) of the Wyoming Rules of Civil Procedure, which provides that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Formisano v. Gaston*, 2011 WY 8, ¶ 3, 246 P.3d 286, 288 (Wyo.2011). We review a grant of summary judgment as follows:

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. [*Snyder v. Lovercheck*, 992 P.2d 1079, 1083 (Wyo.1999) ]; *40 North Corp. v. Morrell*, 964 P.2d 423, 426 (Wyo. 1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of a material fact for trial. *Roberts v. Klinkosh*, 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo.1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh*, 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997).

*Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo.2011).

## DISCUSSION

### I. BREACH OF AGREEMENT CLAIMS

[¶ 12] Review of the rock removal and as-built survey claims requires consideration of the Agreement according to our rules of interpreting easements.

Easements are reviewed under the same principles that have been established for interpretation of contracts. *Lozier v. Blattland Investments, LLC*, [2004 WY 132, ¶ 9,] 100 P.3d 380, 383–384 (Wyo. 2004); *Klutznick v. Thulin*, 814 P.2d 1267, 1270 (Wyo.1991). The primary goal is to determine the intention of the parties from a close reading of the document language and by interpreting the terms of the document according to their plain and ordinary meaning. *Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC*, [2008 WY 69, ¶ 6,] 185 P.3d 1259, 1261–

1262 (Wyo.2008). Determination of the parties' intentions requires common sense and good faith; it also requires consideration of the context within which the contract was made. *Double Eagle Petroleum & Min. Corp. v. Questar Exploration & Production Co.*, [2003 WY 139, ¶ 8,] 78 P.3d 679, 681–682 (Wyo.2003). If necessary, the reviewing court may also look to the circumstances surrounding the contract, as well as its subject matter and the purpose of the contract to glean the intent of the agreement. *Id.* Any examination of the context within which the contract was drawn is limited to ascertaining the intent of the parties in making the agreement. *Id.* The context "cannot be invoked to contradict the clear meaning of the language used, and those extraneous circumstances do not justify a court in proceeding to insert therein a provision other than or different from that which the language used clearly indicates, and thereby, in effect, make a contract for the parties." *Lozier v. Blattland Investments, LLC,* 100 P.3d 380, 383–384 (Wyo.2004). *Davison v. Wyo. Game & Fish Comm'n,* 2010 WY 121, ¶ 9, 238 P.3d 556, 560 (Wyo. 2010).

[¶ 13] In interpreting contracts, we have also said that the "language of the parties expressed in their contract must be given effect in accordance with the meaning which the language would convey to reasonable persons at the time and place of its use." *Union Pacific Railroad Co. v. Caballo Coal Co.,* 2011 WY 24, ¶ 15, 246 P.3d 867, 872 (Wyo.2011) (quoting *Moncrief v. Louisiana Land & Exploration Co.,* 861 P.2d 516, 524 (Wyo.1993)). The contract as a whole should be considered, taking into consideration the relationship between the various parts. *Moncrief,* 861 P.2d at 524. Courts may consider the circumstances surrounding execution of the agreement to determine the parties' intention, even in reviewing unambiguous contracts. *Ultra Res., Inc. v. Hartman,* 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo.2010); *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 6, 126 P.3d 909, 915 (Wyo.2006); *Caballo Coal Co. v. Fidelity Expl. & Prod. Co.,* 2004 WY 6, ¶ 11, 84 P.3d 311, 314–15 (Wyo.2004).

[¶ 14] As with a contract, if the language of an easement is ambiguous, we may use extrinsic evidence in an effort to determine the intentions of the parties. *Davison,* ¶ 9, 238 P.3d at 560. A contract is ambiguous if it can be read in more than one way. *Dwan v. Indian Springs Ranch Homeowners Ass'n, Inc.,* 2008 WY 74, ¶ 9, 186 P.3d 1199, 1202 (Wyo.2008). The determination of whether a contract is ambiguous is a question of law for the court to decide. *Davison,* ¶ 9, 238 P.3d at 560; *State ex rel. Arnold v. Ommen,* 201 P.3d 1127, 1137 (Wyo. 2009).

### A. *Rock Removal Breach*

### 1. *Meaning of Paragraph 8(m)*

[¶ 15] Paragraph 8(m) is the only provision in the Agreement governing rock removal. It provides:

> When rock conditions are encountered in the construction of the pipeline rock shall be removed from said premises. The word rock as used in herein shall not include sand, gravel or rocks less than two inches (2″) in diameter and boulders may be retained on the right-of-way per Grantor's direction.

The parties agree that the provision is unambiguous but disagree as to its meaning. Berthel contends that the provision requires Rockies Express to remove all rock greater than two inches in diameter, from both the surface and subsurface. In other words, Rockies Express may not bury the rock it digs up and must instead remove it from the property altogether. Rockies Express, on the other hand, contends that the provision requires the removal of rock greater than two inches in diameter from the surface only, and asserts it may otherwise rebury the rock it digs up.

[¶ 16] The district court agreed with the parties that the rock removal provision was unambiguous, and it interpreted it to require removal of rock only from the surface of the easement. We likewise find the provision unambiguous, and based on the plain mean-

ing of its terms we interpret it to require removal of surface rock only.[1]

[¶ 17] Paragraph 8(m) does not use the terms surface or subsurface and instead requires that rock encountered in construction of the pipeline be removed from the "premises." The question then is whether the term "premises" means surface, subsurface, or both. The dictionary definition of premises is "a tract of land with buildings thereon," or "a building or part of a building usu. with its appurtenances (as grounds)." *Merriam–Webster's Collegiate Dictionary* 980 (11th ed.2007). The legal definition of the term is similar: "A house or building, along with its grounds (smoking is not allowed on these premises)." *Black's Law Dictionary* 1300 (9th ed.2009).

[¶ 18] The plain meaning of the term "premises" relates to the land's surface, an interpretation that is confirmed by the remainder of Paragraph 8(m). The provision's second and final sentence defines the term "rock" and allows boulders to "be retained *on* the right-of-way per Grantor's direction." (Emphasis added.) The overall tenor of the provision is a concern with the easement surface.

[¶ 19] The only subsurface concern that Berthel has alluded to is the subsurface rock's impact on revegetation, its contention being that "premises" means surface and subsurface and was intended to address concerns with revegetation. As noted above, our primary and most important objective in interpreting the Agreement is to ascertain the parties' intent. In doing so, we consider the plain language and its relationship to other provisions in the Agreement. Using this approach, we must reject Berthel's proffered interpretation. The parties were indeed concerned with vegetative disturbance,

and those concerns are addressed in the Agreement's Paragraph 8(d):

Grantee shall affect a minimum of vegetative or soil disturbance, consistent with practical operations, and will smooth and maintain all disturbed areas to conform as nearly as practical with the adjacent terrain, and provide and maintain adequate water drainage to minimize erosion; after the initial construction of the pipeline covered by this Agreement is completed, or upon completion of any subsequent maintenance or replacement of the facilities causing vegetative or soil disturbance, all disturbed areas shall be restored and reseeded by Grantee. Also such restoration and reseeding shall be completed by Grantee using FERC specifications then in effect[.]

[¶ 20] Not only does the Agreement's rock removal provision, Paragraph 8(m), not mention subsurface concerns or concerns with revegetation or soil disturbance, the parties expressly addressed those issues in a separate provision. If Berthel's concern is with the presence of construction-produced rock on the land's surface, its recourse is through Paragraph 8(m). If its concern is alternatively with restoration of the soil or vegetation, its recourse is through Paragraph 8(d). In other words, it is unlikely the parties intended to address revegetation concerns in Paragraph 8(m), given that those concerns were separately addressed in Paragraph 8(d).

[¶ 21] That Paragraph 8(m) was intended to require removal only of surface rock is an interpretation confirmed by the facts and circumstances surrounding the Agreement's negotiation. As discussed, even when a contract's language is unambiguous, this Court may consider the facts and circumstances surrounding the making of the contract to

---

1. As noted earlier, the judge presiding over this case changed after the entry of summary judgment on liability. The summary judgment order did not provide findings of fact, contract interpretation, or a rationale for the decision. This has complicated our review, and likely the district court's consideration of the issues that went to trial. For these reasons, we take this opportunity to again encourage district courts to provide findings of fact and their reasoning when ruling on summary judgment motions. *Baldwin v.*

*Dube,* 751 P.2d 388, 394 (Wyo.1988) ("Absence from the record of a specific basis upon which summary judgment was sought or granted is a handicap to the reviewing court, although specific bases are not mandatory under the rule.") (quoting *Centrella v. Morris,* 597 P.2d 958, 962 (Wyo.1979)); *Weaver v. Blue Cross–Blue Shield of Wyoming,* 609 P.2d 984, 986 (Wyo.1980) ("[W]e would prefer that the reasons for granting a motion for summary judgment appear clearly in the record.").

determine the parties' intent and the plain meaning of the terms used. *Davison*, ¶ 9, 238 P.3d at 560; *see also Ecosystem Resources, L.C. v. Broadbent Land & Resources, L.L.C.*, 2007 WY 87, ¶¶ 34–36, 158 P.3d 685, 693–694 (Wyo.2007) (facts and circumstances evidence may include case law, nature of parties, type of land covered by deed, purpose of conveyances and/or reservations, railroad's use of timber in business activities, and consideration paid); *Mullinnix*, ¶¶ 13–20, 126 P.3d at 916–19 (facts and circumstances evidence included nature of parties (ranchers with limited formal education), use of terms such as "oil rights" in casual versus formal contexts, and nature of petroleum industry at time of execution (gas considered unwanted byproduct of oil production)); *Boley v. Greenough*, 2001 WY 47, ¶¶ 13–23, 22 P.3d 854, 858–60 (Wyo.2001) (facts and circumstances evidence included evidence demonstrating meaning of term had evolved, nature of grantors' mineral interests, history of oil and gas development on property, and fact that parents assigned interests as gifts to their children immediately after discovery of oil and gas on their land). Our goal is to effectuate the parties' intent by giving their contract terms "the meaning which the language would convey to reasonable persons at the time and place of its use." *Union Pacific*, ¶ 15, 246 P.3d at 872.

[¶ 22] Bernie Lowery, one of the owner-partners in Berthel, provided the following deposition testimony concerning negotiation of the rock removal provision, which testimony Berthel submitted to the district court in support of its summary judgment motion:

Q. Do you remember any particular provisions of the contract that you spent more time on than others?

A. No. I can't really recall trying to measure time, but I do know the covenant pertaining to removal of the rock, which is becoming an important issue, or has become an important issue, was certainly an important issue at the time of the negotiations because it was so important to me that they did not leave our place, after they got done with their work, looking like a previous pipeline had left the place before we bought the ranch.

And I told them that—I asked them, rather, what are you going—What are your plans when you encounter rock on our ranch? And they had never visited the ranch. And they had no idea what I was talking about.

And I tried to explain to them what a mess was going to be left after they had to blast the rock out of there. And they had not come across that type of terrain before, and had not personally visited our ranch, and I told them that I thought we were entitled to more money than anyone else along the line because they were going to leave our place a mess. And they disagreed and wanted to go and inspect what I was talking about.

And so we made a special trip with Needham, I believe is his name, and Skelton, and they observed what I was referring to on a previous project.

Q. And I've seen some of the photos, and they show big piles of rocks left and things like that.

A. Exactly. So they explained that they would never leave a job looking like that, and they could understand why I was upset. And I said, well, see, you need to know this, because now you understand why I want more money.

And they said, well, we can't give you any more money, our hands are tied there, but maybe we can come up with some special wording in our agreement that you can live with.

* * * *

Q. Now, when you were negotiating the rock provision, why was it important to you that the rocks be removed? You've said—Let me back up. You said that you didn't want it to look like the other pipelines that came through there. What were your reasons for not wanting rocks left on the property?

A. Well, first off let me say, removing the rock was not my suggestion, and it was not my demand, not that I had much room to demand anything. I wanted more money because I felt they would leave the place in a mess.

* * * *

Q. Does the—So it sounds like what you're telling me is that rocks don't impact necessarily how you use the land, things like that, what you were really looking for is more compensation and it was a trade-off?

A. Well, they do impact the land, that's why I didn't want them there.

Q. In your opinion how does it impact the land?

A. First off it's unsightly. Second off, you can't grow anything on it. You can't drive across it. But most of all it's unsightly.

Q. So aesthetic reasons was your main concern?

A. Well, that equates to financial reasons, so my concern is always the bottom line. And when something becomes unsightly, whether it's your house or a piece of property or your girlfriend, they—

Q. It's worth less?

A. They affect the bottom line, yeah.

\* \* \* \*

Q. \* \* \* I'm talking just about the Rockies Express, if you believe that the land is worth less because of the way the easement was left, the reclamation?

A. Yes.

Q. Okay. And why do you think that?

A. It's unsightly.

Q. Okay. Does it detract from—In what way does it detract from what was already there?

A. Makes it more unsightly.

[¶ 23] In addition to Mr. Lowery's testimony, representatives of Rockies Express provided deposition testimony, also submitted in support of Berthel's summary judgment motion, that it is standard construction practice to use rock unearthed in ditch construction as fill in burying a pipeline. The circumstances surrounding the rock removal negotiations illustrate that the parties' focus was on the appearance of rock on the surface. Rock piled on the surface was the problem Berthel brought to the attention of Rockies Express, and based on that circumstance, coupled with the standard construction practice of backfilling with rock, there is no reason to suspect

that the parties would have contemplated the removal of subsurface rock. That is, reasonable persons under these facts and circumstances would intend that the provision requires the removal of rock from the right-of-way surface, not the right-of-way subsurface.

[¶ 24] We thus agree with the district court that Paragraph 8(m) requires removal of surface rock only. Using this interpretation, we next consider whether the district court's determination that Berthel had not proven damages for the rock removal breach was clearly erroneous.

### 2. *Damages for Violation of Paragraph 8(m)*

[¶ 25] "In an action for breach of contract, the damages awarded are designed to put the plaintiff in the same position as if the contract had been performed." *Capshaw v. Schieck*, 2002 WY 54, ¶ 10, 44 P.3d 47, 52 (Wyo.2002). The plaintiff carries the burden of producing sufficient evidence to prove its damages with a reasonable degree of certainty. *Knight v. TCB Constr. & Design, LLC*, 2011 WY 27, ¶ 17, 248 P.3d 178, 184 (Wyo.2011). "Damages must be proven with a reasonable degree of certainty, and a court may not resort to speculation or conjecture in determining the proper amount to award." *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo.2012) (quoting *Capshaw*, ¶ 10, 44 P.3d at 52).

[¶ 26] The district court awarded Berthel no damages for the breach of the rock removal provision. In so ruling, the court explained:

> The reason the plaintiff's damage claim as to ¶ 8(m) fails as to the burden of proof is, simply, that the *only* evidence presented to this Court as to what it would cost to remove the rocks relates to a computation based on Mr. Lowery's guess or desire for what should be done and does not relate to contract damages. The *only* evidence presented relates to subsurface rock. The evidence is not broken out in parts, nor are there any references made in the materials, either the formal estimate or the working notes or scope of work, upon which this Court could rely to find that some fraction or portion of the estimate presented by the

plaintiff actually related to surface rock. Being unable then to reasonably extricate from the evidence the cost of removal of surface rock, and because the removal of subsurface rock is not a portion of damages in this case, the Court cannot and will not order damages for the breach. (Emphasis in original.)

[¶ 27] We agree. At trial, Berthel sought in excess of five million dollars in damages. This amount represented what it would cost to have the entire easement excavated to a depth of two feet, the topsoil replaced, and the ground reseeded. Berthel presented no evidence of what it would cost to remove surface rock only, nor any evidence that an operation of this magnitude was required to remove surface rock only. And on appeal, Berthel does not contend otherwise. Instead, Berthel reasserts its right to have both surface and subsurface rock removed and its entitlement to damages measured by the cost of removing both. Because Berthel did not present evidence of what it would cost to remove surface rock only, and the district court would have to speculate as to what that cost might be, we conclude the district court's ruling on rock removal damages was not clearly erroneous.[2]

## B. *As–Built Survey Breach*

[¶ 28] The district court granted Berthel's motion for summary judgment on the question of whether Rockies Express violated Paragraph 8(q), again with no findings of fact, contract interpretation, or rationale for its ruling. Following the trial on damages, the district court, again with a different presiding judge, awarded damages to Berthel. The court calculated the damages necessary to compensate Berthel for the cost of obtaining an as-built survey showing the contours of the land disturbed by the pipeline construction and showing the depth of the pipeline. The court placed a particular emphasis on obtaining the pipeline depth information.

[¶ 29] On appeal, Rockies Express challenges the summary judgment ruling on liability, contending that it did not breach the as-built survey requirement. Berthel challenges the district court's damages award, contending it improperly reduced Berthel's damages from $75,284.65 to $42,820.00. Our initial task is to interpret the requirements of Paragraph 8(q), a question of law, and we then turn to whether issues of fact precluded the district court from granting Berthel summary judgment on Rockies Express' alleged breach of the provision. We will then consider the question of damages.

### 1. *Meaning of Paragraph 8(q)*

[¶ 30] Paragraph 8(q) of the Agreement required Rockies Express to provide Berthel with an as-built survey of the pipeline, as follows:

> Grantee shall provide Grantor with an as-built survey of the pipeline as it pertains to the lands described on Exhibit A. In the event said as-built survey determines that the total distance of the pipeline as measured along the ground surface is greater than the distance depicted in Exhibit A, Grantee shall compensate Grantor for each additional foot at the same price per foot paid as calculated in this Easement. If the distance is less, no adjustment shall be made.

Berthel contends that the purpose of Paragraph 8(q) was two-fold: 1) to calculate the precise linear feet of ground disturbed by the pipeline, so Berthel was compensated for the full length of the pipeline; and 2) to address safety concerns. Rockies Express contends that the requirement served one purpose only and that was to establish the total distance of the pipeline, as built, to ensure Berthel was compensated for the full length of the pipeline.

[¶ 31] Neither party provided, in support of their cross motions for summary judgment, expert evidence on the definition of an "as-built survey," that is, evidence of the

---

**2.** The parties disagreed as to what should be the measure of damages for the rock removal breach, with Berthel contending it should be the cost to cure, and Rockies Express contending it should be the decrease in land value caused by the breach. Because we affirm the decision awarding no damages, we need not resolve this question. For this same reason, we do not address the contention of Rockies Express that the district court erred in granting summary judgment on the question of liability for the breach of the rock removal provision.

term's usage in the construction industry or more particularly in these types of easement agreements. Nonetheless, we find the Agreement to be unambiguous. Paragraph 8(q) requires that Rockies Express provide Berthel an as-built survey, and it specifies that the survey must show "the total distance of the pipeline as measured along the ground surface." The provision then requires that Berthel be paid additional compensation per foot if the distance covered by the pipeline, as measured along the ground, is greater than calculated distance for which Berthel was originally compensated.

[¶ 32] Paragraph 8(q) does not mention the depth of the pipeline, impose any requirement that depth data be provided, or cite safety purposes to be served by the as-built survey. This omission is consistent with the Agreement as a whole. There was no need for Rockies Express to provide depth information in the as-built survey because the Agreement, in Paragraph 8(a), separately requires that the pipeline be installed "to a depth sufficient to provide for a minimum of thirty-six inches (36″) of cover." Additionally, the Agreement bars any activity by Berthel on the easement that could present a safety concern, without first providing notice to Rockies Express. Specifically, Paragraph 3 of the Agreement provides in part:

> Grantor shall not build, construct, or permit to be built or constructed, any structure or obstruction, or impound water or any substance, or change the grade on or over the [E]asement, except that with prior notice to Grantee, Grantor shall be permitted to construct fences, roads, aboveground water lines and distribution systems, power transmission lines, communication lines and wind generation facilities across the Easement.

[¶ 33] The Agreement's unambiguous language required Rockies Express to provide an as-built survey showing the distance of the pipeline as measured along the ground surface. It did not require that Rockies Express provide depth data, and any safety concerns related to such data are addressed by other provisions in the Agreement.

[¶ 34] The question we must next answer then is whether the record supports the district court's summary judgment ruling on the as-built violation; that is, whether the undisputed evidence showed that Rockies Express failed to provide Berthel with an as-built survey showing the required measurement along the ground surface.

### 2. *Violation of Paragraph 8(q)*

[¶ 35] Based on this Court's interpretation of Paragraph 8(q), the question before the district court on summary judgment was whether the as-built survey that Rockies Express gave Berthel provided Berthel with the required measurement along the ground surface, that is, contour measurements. On this question, Berthel submitted to the district court the affidavit of its engineering expert, James Murphy, and the deposition testimony of Mark Miller, the professional land surveyor who performed all surveying work for Rockies Express on the Berthel ranch. The evidence from both of these witnesses indicated agreement that the as-built survey did not provide sufficient data to make the measurements and calculations required by Paragraph 8(q).

[¶ 36] In his affidavit, James Murphy stated:

> I have personally reviewed the "EXHIBIT A BERTHEL LAND AND LIVESTOCK, LTD 42″ PIPELINE AS–BUILT PROFILE" dated 06/22/07 (**EXHIBIT 4**). That profile cannot serve as or be utilized as, an accurate contour as-built survey of the pipeline, because of the lack of detail and/or small scale presented. The actual contour footage of the pipeline cannot be calculated based upon the reviewed document. The reviewed document does not specifically or accurately identify the depth of ground cover existing along the pipeline on the Plaintiff's ranch property. In order to accurately calculate the contour footage of the pipeline as constructed on the Plaintiff's ranch property, a much larger scale, greater detail, of the pipeline, as it has been located in the ditch, would be required, such as would be provided upon as-built alignment sheets.

[¶ 37] Mark Miller testified:

Q. * * * You can't calculate exactly that 114.2 linear contour rods of the pipeline from Exhibit A, can you?

A. No.

Q. Could you calculate that from the as-built only—or as-built alignment sheet?

A. I believe so. I believe they record 3D distances.

Q. Could you calculate it better from the elevation spreadsheet?

A. Yes.

Q. What would be the best document in existence that you could calculate that—

A. The spreadsheet would be.

Q. That contour elevation rod linear footage?

A. Well, I say the spreadsheet would be, but you also have to combine that. The property line information is not in the spreadsheet. The spreadsheet only cares about the pipeline and so it has to be—it's either going to have to be the alignment sheets or from a product that's specifically designed to do that. I would have to have a specific request for a profile with a specific level of detail so that—basically so I knew what was being asked for. I'd have to have a specific request through the customer that this is what we want, please produce it.

[¶ 38] In response, Rockies Express submitted to the district court a copy of the survey provided to Berthel, also known as "Exhibit A," and a copy of a letter from Rockies Express advising Berthel that based on as-built calculations, Berthel was entitled to an additional payment of $403.41.

[¶ 39] The evidence Rockies Express submitted on the question of the as-built liability was insufficient to raise an issue of fact. It simply did not confront, and left unopposed, the evidence of both James Murphy and Mark Miller that the required calculations could not be made from "Exhibit A." We thus conclude that the record supports the district court's ruling that the undisputed evidence showed that Rockies Express failed to provide Berthel with an as-built survey showing the required measurement along the ground surface.

### 3. Damages for Violation of Paragraph 8(q)

[¶ 40] As stated above, damages are designed to put the plaintiff in the same position as if the contract had been performed. *See Capshaw,* ¶ 10, 44 P.3d at 52. With respect to the as-built survey violation, this means that the damages must be such as will compensate Berthel for Rockies Express' failure to provide an as-built survey showing the contour measurements required by Paragraph 8(q).

[¶ 41] In support of its damages claim, Berthel submitted a quote from its engineering expert, James Murphy, detailing the tasks required to complete an as-built survey, and the costs associated with each of those tasks. The total cost calculated by Murphy was $75,284.65, and this was the amount of damages demanded by Berthel.

[¶ 42] The district court accepted the Murphy quote, but modified it in some respects. The district court found Murphy's proposal to survey the depth of the pipeline by digging 245 holes down to the pipeline using heavy equipment to be a dangerous and unreasonable means to determine the pipeline depth. It thus subtracted from the Murphy quote all costs associated with that task and added in the costs of an alternative, safer method of determining the pipeline depth. Based on these adjustments, the district court awarded damages for the as-built survey breach in the amount of $42,820.00.

[¶ 43] We find the district court's award clearly erroneous. Our concern with the award, and with the quote on which it was based, is the emphasis of each on providing an as-built survey that details the precise depth of the pipeline along the easement. Based on our interpretation above, Paragraph 8(q) did not require Rockies Express to provide Berthel with an as-built survey detailing the depth of the pipeline, and costs to provide that level of detail are therefore not a proper element of damages.

[¶ 44] Unlike the damages for rock removal, the damages for the as-built survey violation are itemized, allowing us to make a damages calculation that accurately fits our interpretation of Paragraph 8(q). The Mur-

phy quote is broken down into tasks relating to data gathering and preparation of the final drawings. The data gathering tasks are in turn broken down further into those relating to the contour measurements (required under our interpretation) and the depth measurements (not required under our interpretation). We are thus able to extract the costs of the required tasks and recalculate the damages to which Berthel is entitled.

[¶ 45] Task I of the Murphy quote gathers the data necessary to determine the ground distance, that is, the required contours for calculating the full distance covered by the pipeline. The total cost of this task is $7,200.00. The final task of the Murphy quote is the preparation of a final as-built plan and profile map. The cost associated with this task is $4,535.00. The remaining tasks under the quote relate to excavations to determine depth, which we have deemed unnecessary. Totaling the task costs of $7,200.00 and $4,535.00 would thus conclude our calculation, but for the trial testimony of James Murphy.

[¶ 46] During the trial on damages, Mr. Murphy, on cross-examination, testified that when he provided his affidavit on the adequacy of the as-built survey given to Berthel, and when he calculated his quote to prepare an as-built survey, Berthel had only provided him with one page of the eight-page survey submitted by Rockies Express. He did not have the first seven pages of the survey data. He further testified that the data provided in the first seven pages of the survey was sufficient to allow the preparation of an as-built survey detailing the contour footage, without the costs associated with Task I in his quote:

Q. * * * In your affidavit you said in order to calculate the contour footage of the pipeline as constructed you would need as-built alignment sheets, and those are the measurements that are provided in the first seven pages of Exhibit R?

A. I would agree with that.

Q. So that $7,200 on the second two pages on the as-built drawings, that $7,200 is exactly—what that is for is to establish the distance along the ground?

A. Partially.

Q. The contour footage?

A. Partially as it is discussed in Task 1, that is correct.

What you need to realize is Task 1 carries over to Task 2 because we locate the test pit locations under Task 1. If we didn't have to determine the horizontal or the ground distance we would still have to go out and stake the test pits every hundred feet and at the ground breaks. It may not take quite the level of accuracy that Task 1 required, so I could certainly say that some of that costs would still—under Task 1 would still be required. How much of it may or may not be, I'd have to put a pencil to it.

Q. So—but had you had that—all of Exhibit R at the time you prepared this you would have been able to see exactly what the contour footage was?

A. Correct. That certainly would have affected the costs of Task 1. I'm not going to deny that.

[¶ 47] Mr. Murphy's only apparent reservation with regard to subtracting the Task I costs from the quote was his need for the Task I ground data to facilitate Task II, the gathering of depth data. Because, again, the gathering of depth data is not a proper element of damages, and the original as-built survey contained all the data Mr. Murphy required to complete the as-built survey showing the contour measurements, we must subtract the costs of Task I, $7,200.00, from the damages calculation.

[¶ 48] We conclude that an award of $4,535.00, Mr. Murphy's cost to prepare the final as-built plan and profile map, will place Berthel in the position it would have been had Rockies Express complied with the requirements of Paragraph 8(q).

## II. FRAUDULENT INDUCEMENT CLAIM

[¶ 49] Berthel argues that the district court erred in rejecting its fraudulent inducement claim. Berthel's fraud claim is in essence that Rockies Express promised to remove rock from the premises, it did not complete the promised removal, and therefore its promise was a false representation. We agree with the district court that Berthel did not prove its claim.

[¶ 50]   A plaintiff alleging fraudulent inducement carries the burden of showing by clear and convincing evidence that 1) the defendant made a false representation intending to induce action by the plaintiff; 2) the plaintiff reasonably believed the representation to be true; and 3) the plaintiff suffered damages in relying on the false representation. *Bitker v. First Nat'l Bank in Evanston,* 2004 WY 114, ¶ 12, 98 P.3d 853, 856 (Wyo.2004). "Clear and convincing evidence is the 'kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Alexander v. Meduna,* 2002 WY 83, ¶ 29, 47 P.3d 206, 216 (Wyo.2002) (quoting *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 839 (Wyo. 1980)).

[¶ 51]   The district court considered each element of Berthel's fraudulent inducement claim and found that Berthel had failed to prove any of them. We agree with the district court, but we stop at the first element. Berthel presented no evidence, let alone clear and convincing evidence, that Rockies Express made a false representation during the parties' negotiations. The district court characterized Berthel's argument as a "breach equals falsehood" theory and noted that Berthel had provided no legal support for the argument. This remains true on appeal. Evidence of a breach is just that, and the remedy is damages for that breach. *See Reynolds v. Tice,* 595 P.2d 1318, 1324 (Wyo.1979) (once compensated for loss under breach of contract claim, plaintiff may not recover under fraudulent inducement claim for same loss). A party's breach, standing alone, tells us little regarding that party's intentions or state of mind when negotiating the contract. The clear and convincing burden of proof requires evidence that makes it highly probable the representatives of Rockies Express lied during negotiations. It demands much more than evidence that Rockies Express breached the contract, and Berthel has not met that demand.

### CONCLUSION

[¶ 52]   We affirm the district court's ruling that Berthel failed to prove its damages for violation of the rock removal provision, and we affirm its ruling rejecting Berthel's fraudulent inducement claim. For the reasons stated herein, we affirm in part and reverse in part the court's damages award for breach of the as-built survey requirement and remand for entry of an order awarding Berthel damages in the amount of $4,535.00 for the as-built survey breach.